Robert Mackey (SBN 125961)
bobmackeyesq@aol.com
**LAW OFFICES OF ROBERT MACKEY**
16320 Murphy Road
Sonora, CA 95370
Tel: (412) 370-9110

**MIGLIACCIO & RATHOD LLP**
Zachary O. Chambers (admitted *pro hac vice*)
412 H St. NE
Washington, DC 20002
Tel: (202) 470-3520
Fax: (202) 800-2730
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

*Attorneys for Plaintiffs and Proposed Class*

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANNABEL KADY and ALEXYS TAYLOR, on behalf of themselves and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>OPENCARE, INC.,<br><br>Defendant. | **Case No. 4:25cv5037-KAW**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Annabel Kady and Alexys Taylor ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned counsel, hereby allege the following against Defendant Opencare, Inc. ("Opencare" or "Defendant"). Facts pertaining to Plaintiffs and their personal experiences and circumstances are alleged based upon personal knowledge, and all other facts herein are alleged based upon the investigation of counsel and upon information and good faith belief.

## NATURE OF THE ACTION

1. This is a class action lawsuit for damages and injunctive relief arising from Defendant's unlawful practice of disclosing Plaintiffs' and Class members' individually identifiable health information ("IIHI") and protected health information ("PHI") (referred to herein collectively as "Private Information") to unauthorized third parties including, but not limited to, Google LLC, Meta Platforms, Inc. and TikTok Inc. (collectively, the "Information Recipients").

2. Defendant owns, controls, and maintains https://www.opencare.com/ (referred to herein as the "Website"), a website which requires individuals to share highly sensitive Private Information in order to participate in health screenings and be matched with dental care providers.

3. Defendant installed and implemented "pixels" and similar tracking technologies, including those made available by the Information Recipients (referred to herein as the "Tracking Technologies") on the Website.

4. Invisible to the naked eye, each of the Tracking Technologies collects and transmits information from the user's browser to the corresponding Information Recipient as the user enters information into the Website. The Tracking Technologies secretly enable the unauthorized transmission and disclosure of Plaintiffs' and Class Members' Private Information to the Information Recipients by Defendant.

5. Through the use of Tracking Technologies, Defendant's Website directs Plaintiffs' and Class members' communications—including Private Information—to automatically be sent to the servers of the corresponding Information Recipients. This occurs on every webpage on which Defendant installed the Tracking Technologies, including pages that are generally accessible even without an account with Defendant.

6. Thus, operating as implemented by Defendant, the Tracking Technologies allow the Private Information that Plaintiffs and Class members submit via the Website in confidence to be unlawfully disclosed to the Information Recipients alongside the individual's unique Google and/or TikTok identifiers, including his or her Google account and other identifying information.

7. Defendant chose to implement systematic tracking across the Website, meaning that their Users' identities and information intimately tied to their healthcare, including searches for treatments for their specific dental conditions, booking information, and insurance information—each

of which is Private Information—is communicated to the Information Recipients as a user interacts with the Website. That this information is tied to the Users' personal medical care is indisputable due to the systematic nature of the tracking implemented by Defendant and the healthcare focus of Defendant's business. A User is tracked each step of the way, from landing on the homepage to researching conditions and providers to researching treatment locations, to booking a specific treatment for that condition. There can be no doubt that this information is related to the individual's personal healthcare needs.

8. To take an example, Google's Tracking Technologies send tremendous amounts of data to Google, unbeknownst to the user. As one District Court recently described:

> Whenever a user visits a website that is running Google Analytics, Ad Manager, or some similar Google service, Google's software directs the user's browser to send a separate communication to Google. This happens even when users are in private browsing mode, unbeknownst to website developers or the users themselves. The operation is not in dispute. When a user visits a website, the user's browser sends a "GET" request to the website to retrieve it. This GET request contains the following information: the Request URL, or the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. At the same time, the user's browser reads Google's code, which is embedded on the website. Google's code instructs the user's browser to send a second and concurrent transmission directly to Google. This second transmission tells Google exactly what a user's browser communicated to the website.[1]

9. While Defendant willfully and intentionally incorporated the Tracking Technologies into the Website, Defendant failed to affirmatively disclose to Plaintiffs or Class members that they shared their sensitive and confidential assessment responses via the Website with third parties.

10. Healthcare patients simply do not anticipate that their trusted healthcare provider will send Private Information collected via its website to undisclosed third parties. By employing third-party trackers Defendant effectively bartered the private medical information of its patients for more detailed analytics of its users to increase its revenues and profits.

[1] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 919-20 (N.D. Cal. 2023) (internal citations omitted).

11. Despite numerous warnings from federal regulators (and several Federal Trade Commission enforcement actions against telehealth companies for similar conduct) about the data privacy risks of using third-party tracking technologies,[2] Defendant designed and maintained its Website so that users would be required to submit Private Information in order to participate in health assessments, review treatments offered by Defendant, and obtain dental services through Defendant. By so doing, Defendant violated numerous federal and state laws and breached numerous common law duties to its customers.

12. Defendant owed common law, contractual, statutory, and regulatory duties to keep Plaintiffs' and Class members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class members' Private Information, Defendant assumed legal and equitable duties to patients to protect and safeguard their Private Information from unauthorized disclosure.

13. Defendant, however, failed in its obligations and promises by utilizing the Tracking Technologies on the Website as described herein, knowing that such technology would transmit and share Plaintiffs' and Class members' Private Information with the Information Recipients.

14. Defendant breached its obligations to Plaintiffs and the Class members in one or more of the following ways: (1) failing to adequately review their marketing programs and web-based technology to ensure the Website was safe and secure; (2) failing to remove or disengage technology that was known and designed to share patients' Private Information; (3) failing to obtain the consent of patients, including Plaintiffs and Class members, to disclose their Private Information to the Information Recipients; (4) failing to take steps to block the transmission of Plaintiffs' and Class members' Private Information through the Tracking Technologies; (5) failing to warn Plaintiffs and

---

[2] *See, e.g.*, Heather Landi, FIERCE HEALTHCARE, *Regulators Warn Hospitals and Telehealth Companies about privacy risks of Meta, Google Tracking Tech*, (July 21, 2023), *available at* https://www.fiercehealthcare.com/health-tech/regulators-warn-hospitals-and-telehealth-companies-about-privacy-risks-meta-google (last visited Nov. 28, 2023) (noting that the FTC and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) issued a rare joint release announcing that 130 hospital systems and telehealth providers received a letter warning them about the data privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps).

Class members of such sharing and disclosures; and (6) otherwise failing to design and monitor the Website to maintain the confidentiality and integrity of patients' Private Information.

15. Defendant intentionally chose to put its profits over the privacy of their users, which number over one million. The unilateral disclosure of users' Private Information in this manner is unquestionably a violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), among other statutory and common laws.

16. The disclosure of Plaintiffs' and Class Members' Private Information via the Tracking Technologies contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information. [3]

17. The HIPAA Privacy Rule sets forth policies to protect all IIHI that is held or transmitted by a covered entity such as Defendant. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes PHI.[4]

18. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as Google Analytics, they can do so only in a very limited way, to perform analysis on data key to operations.

19. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant

---

[3] HHS.gov, The HIPAA Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited March 24, 2025).

[4] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited March 21, 2023) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

are simply ***not*** permitted to use tracking technology tools (like pixels) in a way that exposes patients' Private Information to any third party without express and informed consent.

20. Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights ("OCR") at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "HHS OCR Bulletin"), that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[5]

21. Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") published a bulletin which is permanently live on New York University's ("NYU") Program on Corporate Compliance and Enforcement page entitled *Protecting the privacy of health information: A Baker's dozen takeaways*

---

[5] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html, HHS.GOV (emphasis added) (last visited December 17, 2025). The Bulletin notes that "IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services." *Id.* This guidance was recently vacated in part due to the court finding it in part to be the product of improper rulemaking, and it is cited for reference only until OCR updates its guidance, should it do so in the future. *See American Hosp. Ass'n. v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024). The Court's Order found only that OCR's guidance regarding covered entities' collection and disclosure to third parties of users' IP addresses while they navigated unauthenticated public webpages ("UPWs") was improper rulemaking. The Order in no way affects or undermines OCR's guidance regarding covered entities disclosing unique personal identifiers, such as Google or Facebook identifiers, to third parties while patients make appointments for particular conditions, pay medical bills or log into (or use) a patient portal. *See Id.* at 789-90, 807, n. 8 (vacating OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document.").

*from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx* and *Flo Health* ***make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.***"[6]

22. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should ***not*** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.**
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking Pixels on websites or software development kits on apps, watch out.***

23. Recent FTC enforcement actions such as *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that ***may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information***.[7]

24. Plaintiffs bring this lawsuit on behalf of similarly situated individuals whose sensitive

---

[6] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* NYU COMPLIANCE AND ENFORCEMENT https://wp.nyu.edu/compliance_enforcement/2023/09/04/protecting-the-privacy-of-health-information-a-bakers-dozen-of-takeaways-from-ftc-cases/ (emphasis added) (last visited January 1, 2026).

[7] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization.

Private Information was intentionally, recklessly, and/or negligently disclosed to the Information Recipients through Defendant's unauthorized utilization of the Tracking Technologies.

25. The Private Information that the Tracking Technologies gathered from Defendant's Website and sent to the Information Recipients included the Private Information that Plaintiffs and Class members submitted to Defendant's Website, including for example, particular health conditions, types of health treatment sought and/or received, insurance information, and other confidential IIHI and PHI.

26. The Information Recipients in turn use Plaintiffs' and Class members' Private Information for business purposes, including using such information to improve advertisers' ability to target specific demographics and selling such information to third-party marketers who target Plaintiffs and Class members online (*i.e.*, through their social media and personal accounts).

27. Plaintiffs and Class members have suffered injury as a result of Defendant's conduct. These injuries include (1) invasion of privacy, (2) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the transmissions of their Private Information to the Information Recipients, (3) loss of the benefit of the bargain, (4) diminution of value of the disclosed Private Information, (5) statutory damages, and (6) the continued and ongoing risk to their Private Information.

28. Plaintiffs seek to remedy these harms and bring causes of action for: (1) negligence; (2) common law invasion of privacy (intrusion upon seclusion); (3) violation of Article I, Section 1 of the California Constitution (Invasion of Privacy); (4) breach of confidence; (5) unjust enrichment; (6) violations of the Electronics Communication Privacy Act ("ECPA"), 18 U.S.C. § 2511(1); (7) violations of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631; (8) unlawful use of a pen register or trap and trace device, Cal. Penal Code § 638.51; and (9) violations of the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56, *et seq.*

## PARTIES

### A. Plaintiff Annabel Kady

29. Plaintiff Kady is a citizen of the State of California residing in Los Angeles and brings this action in an individual capacity and on behalf of all others similarly situated.

30. On multiple occasions beginning around approximately July of 2023, Plaintiff Kady utilized Defendant's Website on her personal electronic devices to research conditions and treatments, find local dentists, and book appointments. In the process of using Defendant's services, Plaintiff was required to disclose highly sensitive IIHI and PHI to Defendant.

31. Plaintiff Kady had Google, Facebook, and TikTok accounts while she used Defendant's services and she accessed Defendant's Website while logged into her Google account on the same device. After providing her Private Information to Defendant through the Website, Plaintiff Kady immediately began seeing targeted health ads as she scrolled through her accounts. An example of such an advertisement received by Plaintiff Kady is included below.

32. While Plaintiff was a user of Defendant's Website, she never consented to or authorized the use of her Private Information by third parties or to Defendant enabling third parties to access, interpret, and use such Private Information.

33. Plaintiff was injured by Defendant's unauthorized disclosure of confidential medical information concerning dental surgery required after a traumatic accident. Defendant's actions subjected her to unsolicited targeted advertising related to the specific medical services she researched and caused significant mental distress arising from the knowledge that unauthorized third parties had been made aware of her medical conditions and the fear that her friends, family, or colleagues might see these advertisements and thereby learn of her medical conditions. Additionally, Plaintiff lost the benefit of her bargain with Defendant. Plaintiff used the Website to look at treatments and book appointments, believing that Defendant would keep her Private Information confidential and would not have done so had she known of Defendant's actual practices. Finally, Defendant's practice of sharing Plaintiff's Private Information has diminished the value of the disclosed Private Information.

34. Pursuant to the systematic process described in this Complaint, the Private Information that Plaintiff entrusted to Defendant was disclosed to the Information Recipients without Plaintiff's knowledge or consent.

35. Defendant transmitted and/or enabled the transmission of such Private Information without Plaintiff's knowledge, consent, or express written authorization. By failing to receive such

requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

36. But for Plaintiff's status as a user of Defendant's services and Defendant's express and implied promises regarding the security of her Private Information, Plaintiff would not have disclosed such information to Defendant.

37. Plaintiff Kady first discovered that Defendant had collected and shared her Private Information without her consent on or around March 13, 2025, after contacting undersigned counsel and discussing potential claims against Defendant.

**B. Plaintiff Alexys Taylor**

38. Plaintiff Taylor is a citizen of the state of Michigan residing in Grand Rapids and brings this action in an individual capacity and on behalf of all others similarly situated.

39. In or around March of 2025, Plaintiff Taylor utilized Defendant's Website on her personal electronic devices to research conditions and treatments and to find local dentists. In the process of using Defendant's services, Plaintiff Taylor was required to disclose highly sensitive IIHI and PHI to Defendant.

40. Plaintiff Taylor had a Google account while she used Defendant's services and she accessed Defendant's Website while logged into her Google account on the same device. After providing her Private Information to Defendant through the Website, Plaintiff Taylor immediately began seeing targeted health ads as she scrolled through her accounts. An example of such an advertisement received by Plaintiff Taylor is included below.

41. While Plaintiff was a user of Defendant's Website, she never consented to or authorized the use of her Private Information by third parties or to Defendant enabling third parties to access, interpret, and use such Private Information.

42. Plaintiff was injured by Defendant's unauthorized disclosure of her confidential medical information. Defendant's actions subjected her to unsolicited targeted advertising related to the specific medical services she researched and caused significant mental distress arising from the knowledge that unauthorized third parties had been made aware of her medical conditions and the fear that her friends, family, or colleagues might see these advertisements and thereby learn of her medical

conditions. Additionally, Plaintiff lost the benefit of her bargain with Defendant. Plaintiff used the Website to look at treatments options, believing that Defendant would keep her Private Information confidential and would not have done so had she known of Defendant's actual practices. Finally, Defendant's practice of sharing Plaintiff's Private Information has diminished the value of the disclosed Private Information.

43. Pursuant to the systematic process described in this Complaint, the Private Information that Plaintiff entrusted to Defendant was disclosed to the Information Recipients without Plaintiff's knowledge or consent.

44. Defendant transmitted and/or enabled the transmission of such Private Information without Plaintiff's knowledge, consent, or express written authorization. By failing to receive such requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

45. But for Plaintiff's status as a user of Defendant's services and Defendant's express and implied promises regarding the security of her Private Information, Plaintiff would not have disclosed such information to Defendant.

46. Plaintiff Taylor first discovered that Defendant had collected and shared her Private Information without her consent on or around May 1, 2025, after contacting undersigned counsel and discussing potential claims against Defendant.

**C. Defendant**

47. Defendant Opencare, Inc. is a corporation incorporated in Delaware and headquartered in San Francisco. Defendant focuses on the provision of dental care by connecting patients with local dentists. On the Website, Defendant touts that "we've built a curated network of top-rated dentists across North America who are committed to delivering world class oral wellness."[8]

48. On April 4, 2025, Plaintiffs sent a letter to Defendant via certified mail notifying Defendant of their claims asserted herein and their intent to file suit. Defendant failed to respond.

**<u>JURISDICTION & VENUE</u>**

---

[8] *Say Hello To Opencare*, Opencare.com, *available at* https://www.opencare.com/about/ (last visited March 26, 2025).

49. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

50. This Court has personal jurisdiction over Defendant because it operates and maintains its principal place of business in this District. Further, Defendant is authorized to and regularly conducts business in this District and makes decisions regarding corporate governance and management of the Website in this District, including decisions regarding the privacy of patients' IIHI and PHI and the incorporation of the Tracking Technologies.

51. Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because: a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendant's governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiffs' and Class members' Private Information; Defendant's principal place of business is located in this District; Defendant collects and redistributes Class members' Private Information in this District; and Defendant caused harm to Class members residing in this District.

## FACTUAL ALLEGATIONS

52. Defendant has utilized the Tracking Technologies since at least February of 2018.

53. Defendant installed the Tracking Technologies on many (if not all) of the pages within the Website and programmed or permitted those pages to surreptitiously share patients' private and protected communications to Defendant with the Information Recipients—communications that included Plaintiffs' and Class members' Private Information.

54. In order to understand Defendant's unlawful data-sharing practices, it is important to first understand some of the basic web design before delving into the Tracking Technologies at issue.

### ***A. Communicating Over The Internet: HTTP Requests, HTTP Responses, and Cookies***

55. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet.

56. Each "client-side" device (such as a computer, tablet, or smartphone) typically accesses web content through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

57. On the other side of the equation, every website is hosted by a computer "server" that holds the website's contents. The entity(ies) in charge of the website exchange communications with users' client devices as the users' web browsers query the server through the internet.

58. Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") requests and HTTP or HTTPS responses, and any given browsing session may consist of the transmission of thousands of individual HTTP requests and HTTP responses, along with corresponding "cookies." Important concepts here are detailed below:

a. **HTTP request**: an electronic communication sent from the client device to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular Universal Resource Locator ("URL") (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL and can include cookies. POST Requests can send a large amount of data outside of the URL. (For instance, uploading a PDF for filing a motion to a court.)

b. **Cookies**: "small files of information that a web server generates and sends to a web browser. Web browsers store the cookies they receive for a predetermined period of time, or for the length of a user's session on a website. They attach the relevant cookies to any future requests the user makes of the web server. Cookies help inform websites about the user, enabling the websites to personalize the user experience. For example, ecommerce websites use cookies to know what merchandise users have placed in their shopping carts."[9] A stored cookie is sent with HTTP requests from

---

[9] *See What are cookies? | Cookies definition*, Cloudlfare.com, *available at* https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited March 24, 2025).

client devices to the host server. Once received, a cookie typically remains on the client side browser and is used by the server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

c. **HTTP response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP request. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data.

59. A user's HTTP request asks the server hosting a website to retrieve certain information (such as a set of health screening questions). The HTTP response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the user's screen as they navigate a website.

60. Every website is comprised of Markup and "Source Code." Source Code is a simple set of instructions that commands the website user's browser to take certain actions when the webpage first loads or when a specified event triggers the code.

61. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP requests quietly executed in the background without notifying the web browser's user.

### *B. The Tracking Technologies Share Users' Actions On The Website Along With Identifying Information*

62. The Tracking Technologies are Source Code that surreptitiously transmit a Website user's communications and inputs to the corresponding Information Recipient much like a traditional wiretap. When individuals visit Defendant's Website via an HTTP request to Defendant's server, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the user, along with Source Code (including the Tracking Technologies). This occurs whether or not the user has an account with Defendant.

63. Thus, Defendant is, in essence, handing its patients a tapped phone and, once the webpage is loaded into the patient's browser, the software-based wiretaps are quietly waiting for

private communications on the webpage to trigger the Tracking Technologies, which then intercept those communications intended only for Defendant and transmits those communications to the corresponding Information Recipient.

64. Third parties like the Information Recipients place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the user associated with the information intercepted (in this case, highly sensitive Private Information).

65. Defendant intentionally configured Tracking Technologies installed on its Website to capture both the "characteristics" of individual patients' communications with the Defendant's Websites (*i.e.*, their IP addresses, unique account identifiers and related information, cookie identifiers, device identifiers and account numbers) and the "content" of these communications (*i.e.*, the buttons, links, pages, and tabs they click and view).

***C. Google's Tracking Technologies: Google Analytics and Signals.***

66. Google is one of the world's largest companies with annual revenues approaching $100 billion a year.[10] Much of this revenue is derived from advertising across platforms, accounting for over 75% of the company's revenue.

67. In conjunction with its advertising business, Google encourages and promotes entities and website owners, such as Defendant, to utilize a Tracking Technology, Google Analytics, to gather, identify, target and market products and services to individuals.

68. Google Analytics allows businesses to send web events, such as clicks, form submissions, and other user actions performed by the user on the Website, from their own servers to Google and other third parties.[11]

69. Google Analytics accomplishes this through a piece of code that a website owner

---

[10] *Alphabet Announces Fourth Quarter And Fiscal Year 2024 Results*, SEC.gov, *available at* https://www.sec.gov/Archives/edgar/data/1652044/000165204425000010/googexhibit991q42024.htm (last visited March 26, 2025).

[11] "Once you've installed the tracking code and have elected to share your data, the Benchmarking Service accrues data from all the sites and pages on which you've placed the Google Analytics tracking code." *See Using the Tracking Code*, Google.com, *available at* https://support.google.com/analytics/answer/1011401?hl=en&sjid=5069058522802209555-NA (last visited March 24, 2025).

elects to embed in their website. When a user visits a page with the Google Analytics code installed the user's browser executes the code and allows Google to collect voluminous information about that user and their interactions with the site.[12]

70. Google Analytics is automatically configured to capture a large amount of data such as when a user visits a particular webpage, that webpage's URL and metadata, button clicks, etc.[13]

71. Advertisers, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom dimension."[14] These are descriptive attributes (such as user type, membership level, or product category) that you define and collect in addition to the default dimensions provided by Google Analytics. They allow you to segment and analyze your data in ways that are not possible with standard fields.

72. Google Signals is a cross-device tracking tool offered by Google and used in conjunction with data gathered by Analytics. The eponymous "signals" are session data from sites and apps that Google associates with users who have signed in to their Google accounts.

73. Google DoubleClick, now integrated into other Google marketing tools though with some legacy nomenclature remaining, was a series of advertising tools used to enhance tracking across the internet.

74. When a visitor has a Google profile, tools like Google Signals and DoubleClick allow the user to be tracked across the internet and the information collected to be associated with a user's

---

[12] "Google signals are session data from sites and apps that Google associates with users who have signed in to their Google accounts, and who have turned on Ads Personalization. This association of data with these signed-in users is used to enable cross-device remarketing, and cross-device key events export to Google Ads." *See [GA4] Activate Google signals for Google Analytics properties*, Google.com, *available at* https://support.google.com/analytics/answer/9445345?hl=en#zippy=%2Cin-this-article (last visited March 24, 2025).

[13] *[GA4] Data Collection*, Google.com, *available at* https://support.google.com/analytics/answer/11593727?hl=en (last visited March 26, 2025).

[14] *[GA4] About Custom Events And Metrics*, Google.com, *available at* https://support.google.com/analytics/answer/14240153?hl=en (last visited March 26, 2025); *see also [GA4] Create User-Scoped Custom Dimensions*, Google.com, *available at* https://support.google.com/analytics/answer/14239618?hl=en&ref_topic=11151952&sjid=11867313698080218124-NA#zippy=%2Canalyze-the-custom-dimension-in-a-report%2Canalyze-the-custom-dimension-in-an-exploration%2Cbuild-an-audience-using-the-dimension.

Google account as well if ad personalization is turned on. This feature is on by default.[15] This associates the data collected by Google Analytics with their name and Google profile, *i.e.*, their real-world identity. Likewise, Google maintains "shadow profiles" on users without Google accounts and links the information collected to the user's real-world identity using their shadow profile.[16]

75. In the HIPAA context, a business associate is a person, or entity, that performs a function or service on behalf of or to a HIPAA-covered entity where the work involves access to, transmission of, or storage of the covered entity's PHI. To ensure that PHI is handled appropriately by outside vendors and entities, a business associate agreement may be required. A business associate agreement is a contract between a covered entity and a business associate which is a requirement of the HIPAA Privacy Rule. The business associate agreement details how PHI is handled, disclosed and safeguarded by the business associate.

76. Importantly, "Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service."[17] Google is extremely clear about this and goes on to state that "Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered."[18] Google even says that "[u]nauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages."[19]

77. Google has faced extensive criticism for its aggressive retargeting efforts. In 2016, the company changed its privacy policy to allow it to associate the data gathered through DoubleClick

---

[15] *Ads Personalization Settings In Google's Publisher Ad Tags*, Google.com, *available at* https://support.google.com/adsense/answer/7670312?hl=en google.com (last visited March 26, 2025).

[16] *Google's Shadow Profile: A Dossier Of Consumers Online And Real World Life*, Gov.UK (Feb. 2019), *available at* https://assets.publishing.service.gov.uk/media/5e1c4985e5274a06b7450a13/Oracle_-_Response_to_SoS_-_Appendix_4_-_Google_Shadow_Profiles.pdf (last visited March 26, 2025).

[17] *Google, HIPAA And Google Analytics*, Google.com, *available at* https://support.google.com/analytics/answer/13297105?hl=en (last visited March 24, 2025).

[18] *Id.*

[19] *Id.*

and other marketing cookies with data gathered through Google's suite of products, with the result that Google's cookies "may now be customized to [an individual] based on your name and other information Google knows about you. It also means that Google could now, if it wished to, build a complete portrait of a user by name, based on everything they write in email, every website they visit and the searches they conduct."[20]

78. If the user is signed into their Google account, data generated by their use of the Website can be shared and cross-referenced across the platforms. As described above by the court in *Brown*, 685 F. Supp. 3d at 919-20, Google's tools collect a tremendous amount of data on users and can arguably identify individuals even without correlating this data as Google Analytics by itself collects browser and device information, the user's approximate location, their behavior on the website, and more.[21]

***D. TikTok's Tracking Technologies: The TikTok Pixel***

79. TikTok is a massive social media company, claiming approximately one-third of Americans as users.[22] TikTok is a wholly owned subsidiary of ByteDance Ltd., a corporation based in China. TikTok's ties to the Chinese intelligence apparatus are well-documented, and TikTok was caught providing the Chinese government with geolocation data on American journalists as recently as 2022.[23]

80. TikTok offers its own version of a Tracking Technology that feeds user-generated information back to TikTok to be linked with users' profiles for marketing purposes (the "TikTok Pixel").

81. A "pixel" is a piece of code that, once configured on a website, "will share information on when an action is taken on [the website owner's] website, based on the events [the

---

[20] *Google Has Quietly Dropped Ban on Personally Identifiable Web* Tracking, Julia Angwin, https://www.propublica.org/article/google-has-quietly-dropped-ban-on-personally-identifiable-web-tracking (last accessed November 19, 2025).

[21] https://support.google.com/analytics/answer/11593727?hl=en (last visited November 19, 2025).

[22] *TikTok Statistics You Need To Know*, Backlino, *available at* https://backlinko.com/tiktok-users (last visited June 3, 2025).

[23] *It's not just a theory. TikTok's ties to Chinese government are dangerous*. Foundation for Defense of Democracies, *available at* https://www.fdd.org/analysis/2024/03/18/its-not-just-a-theory-tiktoks-ties-to-chinese-government-are-dangerous/ (last visited June 3, 2025).

website owner has] set up."[24] Thus the TikTok Pixel functions essentially identically to Google Analytics.

82. TikTok "recommend[s] [the website owner] set up [the TikTok Pixel to record] events that reflect a full customer journey on your site, from viewing a product details page to adding an item to a cart and making a purchase." This allows third parties to track a user as they interact with a website, including how long a person spends on a particular webpage, which buttons the person clicks, which pages they view, the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), and more.

83. The TikTok Pixel also shares the user's identifying information for easy tracking via cookies stored on their computer by any of the Information Recipients with which they have an account. For example, TikTok connects information gathered from the TikTok Pixel "to share personal information about your customers, including emails and phone numbers, and customer browsing behavior on your online store."[25]

***E. The Implementation Of The Tracking Technologies On The Website***

84. The Tracking Technologies are programmable, meaning that Defendant controls which of the webpages on the Website contain the Tracking Technologies, and which events are tracked and transmitted to the Information Recipients.

85. A user's web browser executes the Tracking Technologies' code via instructions within each webpage of Defendant's Website to communicate certain information (within parameters set by Defendant) directly to the corresponding Information Recipients.

86. When a user accesses a webpage that is hosting the Tracking Technologies, like those on the Website, their communications with the Website are instantaneously and surreptitiously duplicated and sent to Google's or TikTok's servers—traveling from the user's browser to the servers.

---

[24] *About Tiktok Pixel*, TikTok.com, *available at* https://ads.tiktok.com/help/article/tiktok-pixel (last visited March 24, 2025).

[25] *About Data Sharing with TikTok Pixel Partners*, TikTok.com, *available at* https://ads.tiktok.com/help/article/data-sharing-tiktok-pixel-partners (last visited March 24, 2025).

87. This second, secret transmission contains the original GET request sent to the Website, along with additional data that Defendant configured the Tracking Technologies to collect. This transmission is initiated by the Tracking Technologies' code and concurrent with the communications with the Website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Google's and TikTok's embedded code.

88. Accordingly, during the same transmissions, the Website routinely provides the Information Recipients with its patients' Google Account IDs, IP addresses, and/or device IDs and the other information they input into Defendant's Website, including not only their medical searches, location information, treatment requests, insurance information (or lack thereof), and the webpages they view. This is precisely the type of identifying information that HIPAA requires healthcare providers to de-anonymize to protect the privacy of patients.[26] Plaintiffs' and Class Members' identities can be easily determined based on Google or TikTok account identifiers, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

89. After intercepting and collecting this information, the Information Recipients process, analyze, and assimilate it into datasets for use by advertisers to target individuals.

90. Data collected through the Tracking Technologies is linked to the user's accounts with the Information Recipients, which generally contain a wide range of demographic and other information about the user, including pictures, personal interests, work history, and other details.

91. Even if a user lacks an account with an information recipient, the data collected by the Tracking Technologies is linked with shadow profiles maintained by the Information Recipients that contain a similar set of information about the user.

92. Importantly, the Private Information disclosed via the Tracking Technologies allows the Information Recipients to know the identity of a specific patient as well as the fact that they are seeking confidential medical care and the type of medical care being sought. The Information

[26] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS.gov, *available at*https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Oct. 19, 2023).

Recipients then use that information to sell advertising to Defendant and other advertisers and/or sell that information to marketers who will online target Plaintiffs and Class members.

93. The Tracking Technologies are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting—*i.e.*, serving online advertisements to people who have previously engaged with a business's website—and other marketing.

94. Defendant used the data it collected from Plaintiffs and Class members, without their consent, in an effort to improve their advertising and bolster their revenues.

***F. The Tracking Technologies Shared Plaintiffs' Sensitive Private Information With Google And TikTok***

95. Plaintiffs and Class members submitted Private Information to Defendant's Website in order to participate in health assessments, insurance assessments, and obtain health-related services and bookings offered through the Website.

96. Concurrently, this information was communicated from the Website (via the Tracking Technologies) to the Information Recipients.

97. When a user visits the Opencare website, the Tracking Technologies load the user's unique user ID from cookies stored in their browser. The Tracking Technologies track the user's activities on the Website and correlate that data with the user's real-world identity and their activities across other sites and platforms.

98. The Tracking Technologies begin collecting and sharing User information as soon as a User visits the website. This operation continues throughout the entire time the User is on the Website.

99. For instance, the Website notifies Google which pages the user visits, with URL specific information transmitted. Even the highly sensitive information that the user types into Opencare's diagnostic form is transmitted. For instance, below you can see the user's inputted location "San Francisco" being transmitted to Google. See the specific traffic in lines cd6 and cd8:




100. Progressing further into the medical questionnaire, the Website sends to Google that the person said "yes" (cd6) in response to whether or not there is an emergency (cd4):




101. As a user proceeds through the diagnostic form on the Opencare website, the information that they input into the form, down to the words that they type, is conveyed to Google. As an example, when a visitor indicates that they have a broken or chipped tooth, this information is sent to Google. When the visitors writes "fell on my face and broke my tooth. There is a lot of swelling, head pain, and slow bleeding" these exact words are transmitted to Google.

102. The Opencare website conveys the user's highly personal preferences and comfort

levels with dentists and dental care to Google. It tells the website what the user considers the most important considerations when choosing a dentist, and when the user last visited a dentist. The latter can be seen below in the beginning of line cd6, with the user stating it was twenty years ago:




103. As the user progresses through this form, Private Information is conveyed to Google at each step. Google is informed that the visitor is very nervous for the dentist visit. The website tells Google that the user has insurance, the identity of their insurance provider, and the fact that their insurance is not accepted.

104. Opencare also sends User's PHI through Google's DoubleClick cookies, another route through which Users' PHI is connected with their real world identity through their Google profiles.[27] For instance, Opencare informs Google that the User is viewing the webpage to check

---

[27] A 2016 change "allowed Google, for the first time, to combine data gathered from cookies that track browsing behavior on nearly 80% of websites with the trove of personal information it holds from its own user accounts." *Google Stealthily Enables 'Super-Profiles'*, https://assets.publishing.service.gov.uk/media/5e1c4913ed915d3b06f2b7b8/Oracle_-_Response_to_SoS_-_Appendix_3_-_Google_Privacy_Policy_Updates.pdf (internal citation omitted) (last accessed Dec. 17, 2025).

insurance eligibility within the dentist location form (url; tiba):




105. Highly sensitive Private Information is likewise shared with TikTok through the same mechanism detailed above. As an example, the website sends a pageview to TikTok noting that the visitor is on the "…/reason/urgentissue/" webpage, so is having a dental emergency:




106. The site also communicates information to Meta through the Meta Pixel, which then allows Meta, using cookies installed on the User's browser, to correlate this information with the User's Facebook profile.[28] Facebook is provided pageview information, such as when the User visits the "find a dentist" webpage.

107. Even if the User does not have a Facebook profile, the Website is configured such that it sends data to Facebook about the website visitor's device for device fingerprinting, allowing Users to be identified and tracked across the internet:

[28] See, e.g., *How We Built A Meta Pixel Inspector*, THE MARKUP, https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last accessed Dec. 17, 2025).




108. In sum, Plaintiff and Class members provided their Private Information to Defendant by browsing the Website, reviewing conditions and available treatments, scheduling appointments, researching issues, and, at all times throughout this process, had a reasonable expectation of privacy in the Private Information Defendant was collecting, including that Defendant would ensure that such Private Information remain secure and protected and only utilized for limited medical and health purposes.

109. Through the use of the Tracking Technologies, Defendant has exposed the Private Information of Plaintiffs and Class Members to numerous third parties, including the Information Recipients. Through the use of cookies and Users' accounts with the Information Recipients, Users' real-world identities are disclosed alongside extremely sensitive PHI and IIHI.

110. Plaintiff Kady routinely suffers emotional and other damages seeing advertisements related to past traumatic health issues and complications that she reasonably believed Defendant would hold in confidentiality. As an example, Plaintiff Kady has received numerous advertisements on her Facebook account, such as the example below:




111. Similarly, Plaintiff Taylor routinely sees ads on Facebook and Instagram related to Opencare, such as the following:




112. In sum, Plaintiffs and Class members provided their Private Information to Defendant by browsing the Website, reviewing conditions and available treatments, creating accounts, completing health assessments, researching doctors and other health-related services providers, making appointments, researching issues, and, at all times throughout this process, had a reasonable expectation of privacy in the Private Information Defendant was collecting, including that Defendant would ensure that such Private Information remain secure and protected and only utilized for limited medical and health purposes.

### *G. Defendant's Use of the Tracking Technologies Violated Users Expectation of Privacy*

113. Defendant breached Plaintiffs' and Class members' right to privacy by unlawfully disclosing their Private Information to the Information Recipients. Specifically, Plaintiffs and Class members had a reasonable expectation of privacy in the Private Information that they shared with

Defendant. This is especially the case prior to users being notified of Defendant's Privacy Policy. As previously noted, users are asked to share a tremendous amount of highly sensitive Private Information prior to being notified of how Defendant will use that information.

114. Defendant further made express and implied promises to protect Plaintiffs' and Class members' Private Information and maintain the privacy and confidentiality thereof.

115. A user of the Website is not asked to review Defendant's privacy practices until well after Defendant has shared copious amounts of IIHI and PHI about that user. Specifically, a user is only asked to consent to Defendant's privacy policy after that user has completed the entire questionnaire on Defendant's Website, imputing highly sensitive information about the user's medical conditions, insurance information, geographic location, dental history, and more. After Opencare has shared all of this sensitive information, users are provided with a small reference to the Defendant's privacy policy page below the form in which they input their email. The form claims that a user consents to Opencare's privacy policy by inputting their email. Many users are likely to miss this as it is in a small font in a grey color.

116. While those who do not complete the process and book appointments are unlikely to ever see Opencare's privacy policy, those who do are promised that "If you do schedule an appointment through Opencare, that information is considered Protected Health Information, and we will not sell that to third parties."[29]

117. Even after being notified of the Privacy Policy users are still deceived and misled. Defendant's Privacy Policy is contradictory and ambiguous. For instance, while it does mention that third parties may "collect information about your activity on our Website" the policy provides scant details as to what is tracked and how that information is used. Moreover, the Privacy Policy provides assurances that "[i]f you do schedule an appointment through Opencare, that information is considered Protected Health Information, and we will not sell that to third parties."[30] Despite the dubious legal conclusion expressed that information only becomes PHI when a user schedules an

---

[29] *Opencare Privacy Policy*, Opencare.com (May 18, 2021), *available at* https://www.opencare.com/privacy/ (last visited March 24, 2025).

[30] *Id.*

appointment, this misleads users about how their information is shared with third parties for profit.

118. Indeed, Defendant's Privacy Policy states that it may receive PHI as a Business Associate and that this "prohibits us from using or disclosing the Protected Health Information in ways that are not permissible by the health care provider itself, and requires us to implement certain measures to safeguard the confidentiality, integrity, and availability of the Protected Health Information."[31] Defendant's Privacy Policy goes on to state that "[w]hen we act as a Business Associate, we may be subject to certain laws and regulations, including certain HIPAA rules, that govern our use and disclosure of Protected Health Information and that may be more restrictive than otherwise provided in this Privacy Policy."[32]

119. By engaging in this improper sharing of information without Plaintiffs' and Class members' consent, Defendant violated its own Privacy Policy and breached Plaintiffs' and Class members' right to privacy and unlawfully disclosed their Private Information.

***H. Defendant's Use of the Tracking Technologies Violates HIPAA***

120. Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[33]

121. Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

122. HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the

---

[31] *Id.*

[32] *Id.*

[33] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

information can be used to identify the individual." 45 C.F.R. § 160.103.

123. The Privacy Rule broadly defines "protected health information" as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

124. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

125. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> A. Names;
>
> …
>
> H. Medical record numbers;
>
> …
>
> J. Account numbers;
>
> …
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers;
>
> … and
>
> R. Any other unique identifying number, characteristic, or code…

45 C.F.R. § 164.514. Additionally, the covered entity must not "have actual knowledge that the

information could be used alone or in combination with other information to identify an individual who is a subject of the information."

126. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

127. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be PHI. The Department of Health and Human Services has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[34]

128. Consistent with this restriction, the HHS has issued marketing guidance that provides, "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[35]

129. Here, Defendant provided patient information to third parties in violation of the Privacy Rule.

130. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical

---

[34] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited Oct. 4, 2023).

[35] *Marketing*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html, HHS.GOV (last visited Oct. 19, 2023).

policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

131. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. section 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

e. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. section 164.306(a)(3); and

f. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

132. Commenting on a June 2022 report discussing the use of Tracking Technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[36]

133. Defendant's placing a third-party tracking code on its Website is a violation of

---

[36] '*Deeply Troubled*': *Security experts worry about Facebook trackers on hospital sites*, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers (last visited Oct. 1, 2023).

Plaintiffs' and Class members' privacy rights under federal law. While Plaintiffs do not bring a claim under HIPAA itself, this violation demonstrates Defendant's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

### *I. Defendant's Use of the Tracking Technologies Violates OCR Guidance*

134. In addition, the government has issued guidance warning that tracking technologies like the Tracking Technologies may run afoul of federal privacy law when installed on healthcare websites.

135. As mentioned previously, the HHS OCR has issued a Bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities And Business Associates* which provides that healthcare organizations regulated under HIPAA may use third-party tracking tools, such as Google Analytics or the Tracking Technologies *only in a limited way*, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.[37]

136. According to the Bulletin, Defendant has violated HIPAA rules by implementing the Tracking Technologies.[38]

137. The bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.*** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the***

---

[37] *See* HHS OCR Bulletin, *supra* n. 5.

[38] *See id*. ("disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures").

***HIPAA Privacy Rule.***[39]

138. Plaintiffs and Class members face the same risks warned of above.

139. Defendant has shared Plaintiffs' and Class members' IIHI and PHI, including: descriptions about medical conditions patients are seeking treatment for; insurance status; medical history; the names of their doctors; the frequency with which they take steps to obtain healthcare for certain conditions; and where they seek medical treatment. This information is, as described in the Bulletin, "highly sensitive."

140. The Bulletin goes on to make clear how broad the government's view of protected information is as it explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, ***or any unique identifying code.***[40]

141. Crucially, the government's Bulletin continues:

> ***All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.***[41]

142. Defendant's sharing of Private Information to the Information Recipients violated Plaintiffs' and Class Members' rights.

***J. Defendant Violated Industry Standards.***

143. It is a cardinal rule that a medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

144. The American Dental Association's ("ADA") Code of Ethics contains numerous rules protecting the privacy of patient data and communications.

145. ADA Code of Ethics 3.1.B. provides:

---

39 *Id.* (emphasis added.)
40 *Id.* (emphasis added.)
41 *Id.* (emphasis added.)

> Dentists are obliged to safeguard the confidentiality of patient records. Dentists shall maintain patient records in a manner consistent with the protection of the welfare of the patient.

146. ADA Code of Ethics Opinion 3.1. provides:

> The dentist has a duty to respect the patient's rights to self-determination and confidentiality. This principle expresses the concept that professionals have a duty to treat the patient according to the patient's desires, within the bounds of accepted treatment, and to protect the patient's confidentiality. Under this principle, the dentist's primary obligations include involving patients in treatment decisions in a meaningful way, with due consideration being given to the patient's needs, desires and abilities, and safeguarding the patient's privacy.

147. ADA Code of Ethics Opinion 3.1.B. further specifies that:

> Dentists are obliged to safeguard the confidentiality of patient records. Dentists shall maintain patient records in a manner consistent with the protection of the welfare of the patient.[42]

148. Defendant's use of the Tracking Technologies also violates Federal Trade Commission ("FTC") data security guidelines. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

149. The FTC's October 2016 publication *Protecting Personal Information: A Guide for Business*[43] established cyber-security guidelines for businesses.

150. These guidelines state that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network vulnerabilities; and implement policies to correct any security problems.

151. Defendant failed to implement these basic, industry-wide data security practices.

---

42 *ADA Principles of Ethics & Code of Professional Conduct*, ADA.org, *available at* https://www.ada.org/-/media/project/ada-organization/ada/ada-org/files/about/2025_code_of_ethics_full.pdf?rev=c4146f72f024459d9ccf01193acf87bc&hash=DBD5C93ED36690D91F565442EE7B86EB (last visited March 31, 2025).

43 *Protecting Personal Information A Guide for Business*, FTC.gov, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited March 31, 2025).

***K. Users' Reasonable Expectation of Privacy.***

152. Plaintiffs and Class members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

153. Indeed, at all times when Plaintiffs and Class Members provided their IIHI and PHI to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

154. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

155. For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[44]

156. Personal data privacy and obtaining consent to share Private Information are material to Plaintiffs and Class members.

***L. IP Addresses are Protected Health Information.***

157. Defendant improperly disclosed Plaintiffs' and Class Members' computer IP addresses to the Information Recipients through their use of the Tracking Technologies *in addition to* unique personal identifiers such as phone numbers, email addresses, dates of birth, Defendant's client ID numbers, services selected, assessment responses, patient statuses, medical conditions, treatments, provider information, and appointment information.

158. An IP address is a number that identifies the address of a device connected to the Internet.

---

[44] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/, CONSUMERREPORTS.ORG (last visited March 31, 2025).

159. IP addresses are used to identify and route communications on the Internet.

160. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

161. Facebook tracks every IP address ever associated with a Facebook user (and with non-users through shadow profiles). Google also tracks IP addresses associated with Internet users.

162. Facebook, Google, and other third-party marketing companies track IP addresses for targeting individual homes and their occupants with advertising.

163. Under HIPAA, an IP address is considered personally identifiable information, defining personally identifiable information as including "any unique identifying number, characteristic or code" and specifically listing IP addresses among examples. 45 C.F.R. § 164.514 (2).

164. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

165. Consequently, Defendant's disclosure of Plaintiffs' and Class Members' IP addresses violated HIPAA and industry-wide privacy standards.

### *M. Defendant Was Enriched and Benefitted from the Use of the Tracking Technologies that Enabled the Unauthorized Disclosures Alleged Herein*

166. The purpose of the Tracking Technologies and other tracking technologies on Defendant's Website was to improve marketing and thereby boost revenues.

167. In exchange for disclosing the Private Information of their accountholders and patients, Defendant is compensated by the Information Recipients in the form of enhanced advertising services and more cost-efficient marketing on their platform.

168. Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions.

169. Defendant retargeted patients and potential patients to get more people to use their services. These patients include Plaintiffs and Class members.

170. Thus, utilizing the Tracking Technologies benefits Defendant by, among other things, reducing the cost of advertising and retargeting.

171. Moreover, Plaintiffs' and Class members' Private Information had value and Defendant's disclosure and interception harmed Plaintiffs and the Class.

172. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

173. The value of health data in particular is well-known, and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[45]

174. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[46]

175. Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions.

176. Policymakers are proactively calling for a revision and potential upgrade of the HIPAA privacy rules out of concern for what might happen as tech companies continue to march into the medical sector.[47]

177. Private Information is also a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use Private Information to commit an array of crimes that include

[45] *See* https://time.com/4588104/medical-data-industry/ (last visited March 31, 2025).
[46] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited March 31, 2025).
[47] *Id.*

identity theft and medical and financial fraud.[48] A robust "cyber black market" exists where criminals openly post stolen IIHI and PHI on multiple underground Internet websites, commonly referred to as the dark web.

178. While credit card information and associated IIHI can sell for as little as $1–$2 on the black market, PHI can sell for as much as $363.[49]

179. PHI is particularly valuable because criminals can use it to target victims with frauds that take advantage of their medical conditions.

180. PHI can also be used to create fraudulent insurance claims, can facilitate the purchase and resale of medical equipment, and it can help criminals gain access to prescriptions for illegal use or sale.

181. Medical identity theft can result in inaccuracies in medical records, costly false claims, and life-threatening consequences. If a victim's health information is commingled with other records, it can lead to misdiagnoses or mistreatment.

182. The FBI Cyber Division issued a Private Industry Notification on April 8, 2014, that advised the following:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.

183. Cybercriminals often trade stolen Private Information on the black market for years following a breach or disclosure. Stolen Private Information can be posted on the Internet, making it publicly available.

184. Defendant gave away Plaintiffs' and Class Members' communications and

---

[48] Federal Trade Commission, *Warning Signs of Identity Theft,* FTC.gov*, available at*: https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited March 31, 2025).

[49] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited March 31, 2025).

transactions on its Website without permission.

185. The unauthorized access to Plaintiffs' and Class Members' private and Personal Information has diminished the value of that information, resulting in harm to Website users, including Plaintiffs and Class Members.

186. Plaintiffs suffered damages in the form of (a) invasion of privacy; (b) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the invasion of privacy; (c) diminution of value of the Private Information; (d) statutory damages; (e) the continued and ongoing risk to his Private Information; (f) lost benefit of the bargain; and (g) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiffs' medical conditions and other confidential information he communicated to Defendant via the Website.

187. Plaintiffs have a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

## **TOLLING**

188. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know—and had no way of knowing—that their Private Information was intercepted and unlawfully disclosed to the Information Recipients because Defendant kept this information secret.

189. A claim may only be dismissed as time-barred if "it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010). The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005). Whether the discovery rule applies is generally a "question of fact unless the evidence can support only one reasonable conclusion." *Ovando v. Cnty. of Los Angeles*, 159 Cal. App. 4th 42, 61 (2008). To trigger the discovery rule, a plaintiff need only plead "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808. Due to the discovery rule, each Plaintiffs' claims did not accrue until shortly before the Complaint was filed. *See Doe v. Microsoft Corp.*, No. C23-0718-JCC, 2023 WL 8780879, at *5 n. 6 (W.D. Wash. Dec. 19, 2023) ("Accepting Plaintiff's

allegations as true, the delayed discovery rule tolls the statute of limitations, making the specific timing of alleged misconduct irrelevant to the analysis.").

190. Here, Plaintiffs could not (and did not) discover Opencare's violations despite their due diligence.[50] Plaintiffs were unable to discover their claims earlier because Opencare had exclusive knowledge of its misconduct, which was carried out using proprietary and surreptitious technology that was not disclosed. Opencare's Privacy Policy promised to keep patient PHI secure, thus any sharing happened despite Defendant's assurances to the contrary. Plaintiffs were aware of Defendant's duty of confidentiality when they sought medical services from Defendant and believed that their information would be kept secure and confidential. These allegations are sufficient to invoke the discovery rule. *See, e.g.*, *Franklin v. Ocwen Loan Servicing*, LLC, No. 18-cv-03333-SI, 2018 U.S. Dist. LEXIS 193485, at *9 (N.D. Cal. Nov. 13, 2018) (holding that the discovery rule applied to plaintiff's claims when "[t]he very nature of plaintiff's allegations is that the recordings were done surreptitiously"); *Harrison v. Great HealthWorks, Inc.*, No. 17cv705 JM (JLB), 2017 U.S. Dist. LEXIS 90900, at *6 (S.D. Cal. June 13, 2017) (finding plaintiff's allegations "that the conduct occurred during the relevant limitations period . . . and . . . that because the recording and/or monitoring was surreptitious, [p]laintiff . . . did not know about, and could not reasonably have discovered, [defendant's] practices" was sufficient to allege the discovery rule tolled his claims); *Microsoft Corp.*, 2023 WL 8780879, at *5 n. 6 (relying on plaintiff's allegation that she "could not with due diligence have discovered the full scope of Defendants' conduct" because Defendants' SDKs were highly technical and there was no indication that would alert a reasonable consumer of Defendants' data collection and interception.").

---

[50] Because Plaintiffs had no reason to suspect Opencare was sharing their Private Information without consent, they were under no obligation to affirmatively search for such misconduct. *See Brown*, 525 F. Supp. 3d at 1071 (accepting allegations plaintiffs were diligent and finding, in any event, that they "were not obligated to investigate their claims until [p]laintiffs had reason to suspect the[ir] existence"); *Josten v. Rite Aid Corp.*, No. 18-cv-0152-AJB-JLB, 2019 WL 3718739, at *4 (S.D. Cal. Aug. 7, 2019) (explaining a reasonably diligent person would have a "hard time piecing [the misconduct] together" without "having the sophisticated knowledge" of the relevant areas); *In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Litig.*, No. ML 18-02814 AB, 2019 WL 6998668, at *3 (C.D. Cal. Sept. 5, 2019) (explaining "[r]easonable diligence does not require a person to scour the internet in search of any and all information").

## CLASS ALLEGATIONS

191. This action is brought by the named Plaintiffs on their behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

192. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All persons residing in the United States who used Defendant's Website and whose Private Information was disclosed to the Information Recipients without their consent.

193. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of a separate state subclass, which is defined as follows:

> All persons residing the state of California who used Defendant's Website and whose Private Information was disclosed to the Information Recipients without their consent ("California Subclass");

194. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

195. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

196. <u>Numerosity</u>. The Class is so numerous that the individual joinder of all members is impracticable. There are at least 1 million patients that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

197. <u>Commonality</u>. Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class members;

b) Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class members to unauthorized third parties;

c) Whether Defendant violated its own privacy policy by disclosing the Private Information of Plaintiffs and Class members to the Information Recipients;

d) Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class members that their Private Information would be disclosed to third parties;

e) Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class members that their Private Information was being disclosed without their consent;

f) Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of users' Private Information;

g) Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Private Information belonging to Plaintiffs and Class members free from unauthorized disclosure;

h) Whether Defendant violated the statutes asserted as claims in this Complaint;

i) Whether Plaintiffs and Class members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j) Whether Defendant knowingly made false representations as to their data security and/or privacy policy practices;

k) Whether Defendant knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

l) Whether Plaintiffs and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Private Information.

198. Typicality. Plaintiffs' claims are typical of those of other Class members because Plaintiffs' Private Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Technologies.

199. Adequacy. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs

has suffered are typical of other Class members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

200. Predominance. Defendant has engaged in a common course of conduct toward Plaintiffs and Class members in that all the Plaintiffs' and Class members' data was unlawfully stored and disclosed to unauthorized third parties, including the Information Recipients, in the same way. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

201. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

202. Defendant has acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

203. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiffs and Class members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c) Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiffs and Class members that their Private Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f) Whether Class members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

204. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class members' names and addresses affected by the unauthorized disclosures that have taken place.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(*On behalf of Plaintiffs & the Nationwide Class*)**

205. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

206. Upon accepting, storing, and controlling the Private Information of Plaintiffs and the Class, Defendant owed, and continues to owe, a duty to Plaintiffs and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive Private Information.

207. Defendant breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' Private Information from unauthorized disclosure.

208. It was reasonably foreseeable that Defendant's failures to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' Private Information through their use of the Tracking Technologies would result in unauthorized third parties, such as the Information Recipients, gaining access to such Private Information for no lawful purpose.

209. Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiffs' and Class members' Private Information arose due to the special relationship that existed between Defendant and its patients, which is recognized by statute, regulations, and the common law.

210. In addition, Defendant had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

211. Defendant's own conduct also created a foreseeable risk of harm to Plaintiffs and Class members and their Private Information. Defendant's misconduct included the failure to (1) secure Plaintiffs' and Class members' Private Information; (2) comply with industry standard data security practices; (3) implement adequate website and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of the Tracking Technologies.

212. As a direct result of Defendant's breach of their duty of confidentiality and privacy and the disclosure of Plaintiffs' and Class members' Private Information, Plaintiffs and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

213. Defendant's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiffs' and Class members' Private Information constituted (and continue to constitute) negligence at common law.

214. Plaintiffs and the Class are entitled to recover damages in an amount to be determined at trial.

**COUNT II**

**COMMON LAW INVASION OF PRIVACY (INTRUSION UPON SECLUSION)**
**(*On behalf of Plaintiffs & the Nationwide Class*)**

215. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

216. The highly sensitive and personal Private Information of Plaintiffs and Class members consists of private and confidential facts and information regarding Plaintiffs' and Class members' health that were never intended to be shared beyond private communications on the Website and the consideration of health professionals.

217. Plaintiffs and Class members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this Information against disclosure to unauthorized third parties, including the Information Recipients.

218. Defendant owed a duty to Plaintiffs and Class members to keep their Private Information confidential.

219. Defendant's unauthorized disclosure of Plaintiffs' and Class members' Private Information to the Information Recipients, third-party tech and marketing giants, is highly offensive to a reasonable person.

220. Defendant's willful and intentional disclosure of Plaintiffs' and Class members' Private Information constitutes an intentional interference with Plaintiffs' and Class members' interest in solitude and/or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

221. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class members' privacy because Defendant facilitated the Information Recipients' simultaneous eavesdropping and wiretapping of confidential communications.

222. Defendant failed to protect Plaintiffs' and Class members' Private Information and acted knowingly when they installed the Tracking Technologies onto the Website because the purpose of the Tracking Technologies is to track and disseminate individual's communications on the Website for the purpose of marketing and advertising.

223. Because Defendant intentionally and willfully incorporated the Tracking

Technologies into the Website and encouraged individuals to use and interact with the Website and the health services thereon, Defendant had notice and knew that their practices would cause injury to Plaintiffs and the Class.

224. As a proximate result of Defendant's acts and omissions, the private and sensitive Private Information, including the IIHI and PHI of Plaintiffs and Class members, was disclosed to unauthorized third parties, causing Plaintiffs and the Class to suffer damages.

225. Plaintiffs, on behalf of themselves and Class members, seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, lost benefit of the bargain, plus pre-judgment interest and costs.

226. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendant and still in the possession of the Information Recipients, and the wrongful disclosure of the Private Information cannot be undone.

227. Plaintiffs and Class members have no adequate remedy at law for the injuries relating to Defendant's and unauthorized third parties' continued possession of their sensitive and confidential Private Information. A judgment for monetary damages will not undo Defendant's disclosure of the Private Information to unauthorized third parties who, upon information and belief, continue to possess and utilize the Private Information.

228. Plaintiffs, on behalf of themselves and Class members, further seek injunctive relief to enjoin Defendant from intruding into the privacy and confidentiality of Plaintiffs' and Class members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

## COUNT III
## VIOLATION OF ARTICLE I, SECTION 1 OF THE CALIFORNIA CONSTITUTION (INVASION OF PRIVACY)
**(*On behalf of Plaintiffs and the Nationwide Class*)**

229. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

230. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

231. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

232. The right to privacy in California's Constitution creates a right of action against private and government entities.

233. Plaintiffs and Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, pursuant to Article I, Section 1 of the California Constitution.

234. The PHI Opencare allowed to be intercepted and transmitted to the Information Recipients without Plaintiffs' and Class Members' consent was used to track them across the internet, to build profiles, and to serve targeted advertisements. The manner in which Opencare allowed this information to be intercepted defeated established privacy-mechanisms and social norms.

235. This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that a trusted healthcare website would allow the interception and monitoring of their medical communications with that Website, let alone using it for advertising.

236. Opencare's conduct violated the privacy of hundreds of thousands (if not millions) of Class Members, including Plaintiffs. Opencare did not have consent for the interception and sharing of this information.

237. Plaintiffs and Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Opencare as a result of its intrusion upon seclusion.

238. Defendant's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiff's or Class Members' rights, Plaintiffs and Class Members are entitled to punitive and exemplary damages.

239. Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

**COUNT IV**
**BREACH OF CONFIDENCE**
**(*On behalf of Plaintiffs & the Nationwide Class*)**

240. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

241. Possessors of non-public medical information, such as Defendant`, have a duty to keep such medical information completely confidential.

242. Plaintiffs and Class members had reasonable expectations of privacy in the responses and communications entrusted to Defendant through its Website, which included highly sensitive Private Information.

243. Contrary to their duties as telehealth institutions and their express promises of confidentiality, Defendant installed the Tracking Technologies to disclose and transmit to third parties Plaintiffs' and Class members' Private Information, including data relating to Plaintiffs' and Class members' health.

244. These disclosures were made without Plaintiffs' or Class members' knowledge, consent, or authorization.

245. The third-party recipients included, but may not be limited to, the Information Recipients.

246. As a direct and proximate cause of Defendant's unauthorized disclosures of Plaintiffs' and Class members' Private Information, Plaintiffs and Class members were damaged by Defendant's breach of confidentiality in that (a) sensitive and confidential information that Plaintiffs and Class members intended to remain private is no longer private; (b) Plaintiffs and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements; (c) Defendant eroded the essential confidential nature of health services that Plaintiffs and Class

members participated in; (d) general damages for invasion of their rights in an amount to be determined by a jury at trial; (e) nominal damages for each independent violation; (f) the unauthorized use of something of value (the highly sensitive Private Information) that belonged to Plaintiffs and Class members and the obtaining of a benefit therefrom without Plaintiffs' and Class members' knowledge or informed consent and without compensation to Plaintiffs or Class members for the unauthorized use of such data; (g) diminishment of the value of Plaintiffs' and Class members' Private Information; and (h) violation of property rights Plaintiffs and Class members have in their Private Information.

## COUNT V
## UNJUST ENRICHMENT
**(*On behalf of Plaintiffs & the Nationwide Class*)**

247. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

248. Defendant benefits from the use of Plaintiffs' and Class members' Private Information and unjustly retained those benefits at Plaintiffs' and Class members' expense. Defendant's business cannot operate with Users providing their PHI and PII, which Defendant then uses to evaluate Users' dental conditions and match Users with dentists.

249. Upon information and belief, Defendant derives a monetary benefit from matching Users with dentists, a function that cannot happen without its Users providing their PHI and PII.

250. This Private Information also has value as to third parties. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

251. The value of health data in particular is well-known, and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and

a significant risk to privacy.[51]

252. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[52]

253. While credit card information and associated IIHI can sell for as little as $1–$2 on the black market, PHI can sell for as much as $363.[53]

254. Indeed, the Information Recipients presumably would not have expended the time and effort required to create the Tracking Technologies if this information was without value.

255. Plaintiffs and Class members conferred a benefit upon Defendant in the form of this monetizable Private Information that Defendant collected from them and disclosed to third parties, including the Information Recipients, without authorization and proper compensation.

256. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

257. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class members because Defendant's conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs or Class members.

258. The benefits that Defendant derived from Plaintiffs and Class members were not offered by Plaintiffs or Class members gratuitously and, thus, rightly belongs to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

259. Defendant should be compelled to disgorge into a common fund for the benefit of

---

[51] *See* https://time.com/4588104/medical-data-industry/ (last visited March 31, 2025).

[52] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited March 31, 2025).

[53] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited March 31, 2025).

Plaintiffs and the Class all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT VI**
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1) *et seq.***
**(*On behalf of Plaintiffs & the Nationwide Class*)**

260. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

261. The ECPA protects both sent and received communications.

262. The ECPA, specifically 18 U.S.C. § 2520(a), provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

263. The transmissions of Plaintiffs' and Class members' Private Information to Defendant via Defendant's Website are a "communication" under the ECPA's definition under 18 U.S.C. § 2510(12).

264. The transmission of Private Information between Plaintiffs and Class members and Defendant via its Website are "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

265. The ECPA defines "content" when used with respect to electronic communications to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

266. The ECPA defines "interception" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

267. The ECPA defines "electronic, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute

"devices" within the meaning of 18 U.S.C. § 2510(5): Plaintiffs' and Class members' browsers; Plaintiffs' and Class members' computing devices; Defendant's web-servers; and the Tracking Technologies deployed by Defendant to effectuate the sending and acquisition of user and patient sensitive communications.

268. The Information Recipients created and provided the Tracking Technologies that Defendant used on its Website.

269. By utilizing and embedding the Tracking Technologies on their Website and/or servers, Defendant intentionally facilitated the interception of, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class members, in violation of 18 U.S.C. § 2511(1)(a).

270. Specifically, Defendant, in cooperation with Information Recipients, implemented electronic devices in the form of the Tracking Technologies that intercepted Plaintiffs' and Class members' electronic communications and unlawfully disclosed Plaintiffs' and Class members' Private Information to the Information Recipients.

271. Defendant and the Information Recipients intercepted communications that included, but are not limited to, communications to/from Plaintiffs and Class members regarding IIHI and PHI, including IP address, Google account information, and health information relevant to the screenings and treatment plans in which Plaintiffs and Class members participated.

272. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class members to the Information Recipients and, potentially, other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

273. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class members, while knowing or having reason to know that the Information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

274. Defendant intentionally intercepted—and facilitated Information Recipients'

interception of—the contents of Plaintiffs' and Class members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, HIPAA and invasion of privacy, among others.

275. At a minimum, Defendant intercepted and disclosed (and facilitated the interception and disclosure of) Plaintiffs' IIHI in violation of HIPAA. HIPAA defines IIHI as:

> [A]ny information, including demographic information collected from an individual, that—(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) *relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual*, and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320-6 (emphasis added). HIPAA also generally prohibits anyone from "knowingly" "disclos[ing] individually identifiable health information to another person." 42 U.S.C. § 1320d-6(a)(3).

276. Accordingly, Defendant is not protected by the so-called "party exception." *See* 18 U.S.C. § 2511(2)(d) (providing that while the Wiretap Act does not apply to electronic communication interceptions by "a party to the communication," the party exception does not apply if the party intercepts the communication "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State").

277. In addition to intentionally implementing the Tracking Technologies in violation of HIPAA and other laws, Defendant intentionally used the unlawful collection and sharing of wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Technologies to track and utilize Plaintiffs' and Class members' Private Information for its own financial benefit.

278. Defendant was not acting under color of law to intercept Plaintiffs' and Class members' wire or electronic communications.

279. Plaintiffs and Class members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class members' privacy via the

Tracking Technologies.

280. Any purported consent that Defendant received from Plaintiffs and Class members was not valid.

281. In sending and in acquiring the content of Plaintiffs' and Class members' communications relating to the browsing of Defendant's Website, creation of accounts, and participation in Defendant's health screenings, Defendant's purpose was tortious and designed to violate federal and state law, including as described above, a knowing intrusion into a private place, conversation, or matter that would be highly offensive to a reasonable person.

**COUNT VII**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA"),**
**Cal. Penal Code § 631**
**(*On behalf of Plaintiffs & the Nationwide Class*)**

282. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

283. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), Plaintiffs need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

284. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

285. Each of the Tracking Technologies is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

286. At all relevant times, by employing the Tracking Technologies, Defendant intentionally tapped, electrically or otherwise, the lines of internet communication between Plaintiffs and Class members on the one hand, and Defendant's Website on the other hand.

287. At all relevant times, Defendant aided, agreed with, employed, and conspired with the Information Recipients to use the Tracking Technologies to wiretap consumers to Defendant's Website and to accomplish the wrongful conduct at issue here.

288. Plaintiffs and Class members did not consent to the Information Recipients' intentional access, interception, reading, learning, recording, and collection of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members consent to Defendant aiding, agreeing with, employing, or otherwise enabling the Information Recipients' conduct.

289. The violation of section 631(a) constitutes an invasion of privacy sufficient to confer Article III standing. Unless enjoined, Defendant will continue to commit the illegal acts alleged here. Plaintiffs continue to be at risk because she frequently uses the internet to search for information about products or services. She continues to desire to use the internet for that purpose, including for the purpose of acquiring healthcare services online. Plaintiffs also continue to desire to use Defendant's Website in the future but have no practical way to know if their website

communications will be monitored or recorded by the Information Recipients.

290. Plaintiffs and Class members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

**COUNT VIII**
**UNLAWFUL USE OF A PEN REGISTER OR TRAP AND TRACE DEVICE**
**Cal Penal Code § 638.51**
**(*On behalf of Plaintiffs and the Nationwide Class*)**

291. This claim is pled in the alternative to Counts VI and VII.

292. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

293. California Penal Code § 638.51(a) makes it unlawful for a person to “install or use a pen register or a trap and trace device without first obtaining a court order.” A “pen register” is “a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication.” Cal. Penal Code § 638.50(b).

294. A “trap and trace device” is a “a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication.” Cal. Penal Code § 638.50(c). In essence, a “pen register” is a “device or process” that records outgoing information, while a “trap and trace device” is a “device or process” that records incoming information. For example, if a user sends an email, a “pen register” might record the email address from which the email was sent, the email address to which the email was sent, and the subject line—because this is the user’s outgoing information. On the other hand, if that same user receives an email, a “trap and trace device” might record the email address from which that email was sent, the email address to which it was sent, and the subject line – because this is incoming information that is being sent to that same user.

295. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Tracking Technologies because the Tracking Technologies are designed to capture the IP address, Private Information and other information such as the phone

number, email, routing, addressing and/or other signaling information of website visitors.

296. Defendant did not obtain consent from Plaintiffs or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA.

297. Plaintiffs and Class members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

**COUNT IX**
**VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT ("CMIA")**
**Cal. Civ. Code § 56, *et seq.***
**(*On behalf of Plaintiffs & the Nationwide Class*)**

298. Plaintiffs re-allege and incorporate by reference the allegations above as if fully set forth herein.

299. Cal Civ Code § 56.101 provides: "Every provider of health care, health care service plan, pharmaceutical company, or contractor who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36."

300. Cal Civ Code § 56.10(a) also provides: "A provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization."

301. Cal Civ Code § 56.10(d) further states that providers of healthcare and contractors "shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient."

302. Plaintiffs and the Class are "patients," as defined in CMIA, Cal. Civ. Code § 56.05(k) ("'Patient' means any natural person, whether or not still living, who received healthcare services from a provider of healthcare and to whom medical information pertains.").

303. Defendant receives medical information, as defined in CMIA, Cal. Civ. Code § 56.05(j), from Users like Plaintiffs, as a core function of its business.

304. Defendant makes this information available to the dentists with whom it creates appointments for patients.

305. Opencare also generates, maintains, and stores sensitive medical information concerning the patients that visit and use its Website. Such information includes not only the medical information provided by its Users but also information about which dentists and treatments are booked by Users.

306. Accordingly, Defendant is a "provider of healthcare," as defined in Cal. Civ. Code § 56.06(a) as Defendant is "organized for the purpose of maintaining medical information in order to make the information available to… a provider of health care [dentists, in Defendant's case] at the request of the individual or a provider of health care… for the diagnosis and treatment of the individual." Defendant is therefore subject to the requirements of the CMIA, Cal. Civ. Code §§ 56.10(a), (d) and (e), 56.36(b), 56.101(a) and (b).

307. Likewise, the CMIA applies to Opencare as a "contractor" under Cal. Civ. Code § 56.05(d) "who creates, maintains, [or] stores" its users' medical information under Cal Civ Code § 56.101. Defendant operates the Website which requires individuals to share highly sensitive Private Information in order to participate in health screenings and be matched with dental care providers.

308. Defendant similarly falls within the definition of a 'recipient of medical information' under Cal Civ Code § 56.13., which provides: "A recipient of medical information pursuant to an authorization as provided by this chapter or pursuant to the provisions of subdivision (c) of Section 56.10 may not further disclose that medical information except in accordance with a new authorization that meets the requirements of Section 56.11, or as specifically required or permitted by other provisions of this chapter or by law."

309. The "CMIA's purpose is to protect the confidentiality of medical records" and exempting Defendant from the CMIA would "undermine[] the purpose of the CMIA". *J.M. v. Illuminate Educ., Inc.*, 103 Cal. App. 5th 1125, 1132 (2024).

310. Defendant disclosed "medical information," as defined in CMIA, Cal. Civ. Code §

56.05(j), to unauthorized persons without first obtaining consent, in violation of Cal. Civ. Code § 56.10(a). The disclosure of information to unauthorized individuals via the Tracking Technologies resulted from the intentional actions and negligent acts and omissions of Defendant, including their implementation of the Tracking Technologies and their failure to (1) secure Plaintiffs' and Class members' Private Information; (2) comply with industry standard data security practices; (3) implement adequate website and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of the Tracking Technologies and other tracking technologies.

311. Specifically, Defendant's negligent and/or willful conduct resulted in the release of Private Information pertaining to Plaintiffs and the Class to unauthorized persons and the breach of the confidentiality of that information. Defendant's acts and omissions failed to preserve the confidentiality of Plaintiffs' and Class members' Private Information in violation of Cal. Civ. Code §§ 56.06 and 56.101(a).

312. Defendant's systems and protocols did not protect and preserve the integrity of electronic medical information belonging to Plaintiffs and the Class, in violation of Cal. Civ. Code § 56.101(b)(1)(A).

313. Plaintiffs and the Class were injured and have suffered damages, as described above, from Defendant's illegal disclosure and negligent release of their medical information in violation of Cal. Civ. Code §§ 56.10 and 56.101, and therefore seek relief under Civ. Code §§ 56.35 and 56.36, including actual damages, nominal statutory damages of $1,000, punitive damages of $3,000, injunctive relief, and attorney fees, expenses and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that this Court enter an Order:

a) Certifying this case as a class action on behalf of the Nationwide Class and the California Subclass defined above, appointing Plaintiffs as representative of the Class, and appointing their counsel as Class Counsel;

b) For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or unauthorized disclosure of Plaintiffs' and Class members' Private Information;

c) For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class members;

d) For an award of damages, including but not limited to, actual, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

e) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

f) Pre- and post-judgment interest on any amounts awarded; and

g) Such other and further relief as this court may deem just and proper.

Dated: September 21, 2026 Respectfully submitted,

*/s/ Zachary O. Chambers*

**MIGLIACCIO & RATHOD, LLP**
Zachary O. Chambers*
Tel: 202.470.3520
zchambers@classlawdc.com
* admitted *pro hac vice*

Robert Mackey (SBN 125961)
bobmackeyesq@aol.com
**LAW OFFICES OF ROBERT MACKEY**
16320 Murphy Road
Sonora, CA 95370
Tel: (412) 370-9110

*Attorneys for Plaintiffs & the Putative Class*